UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**FILED IN CLERK'S OFFICE**
U.S D.C.  Atlanta

NOV 1 0 2005

LUTHER D. THOMAS, Clerk
By:
    *g Reed* **Deputy Clerk**

SECURITIES AND EXCHANGE       :
COMMISSION,
                             :

    Plaintiff,

                             :     CIVIL ACTION NO.

v.

                             :     1:02-CV-2984-MHS

MERCHANT CAPITAL, LLC,
STEVEN C. WYER, and KURT V.    :
BEASLEY,

                             :

    Defendants.

## ORDER

On November 4, 2002, plaintiff Securities and Exchange Commission

("SEC") filed this action against Merchant Capital, LLC ("Merchant Capital"),

and its principals, Steven C. Wyer and Kurt V. Beasley.  The complaint

alleged that defendants had raised approximately $20 million from more than

350 investors through a fraudulent scheme involving the sale of general

partnership interests in Colorado registered limited liability partnerships,

which were formed to purchase and collect debt pools consisting of freshly

charged off consumer debt.

Specifically, the SEC alleged that Merchant Capital's sales materials misrepresented the fees to be charged in connection with the operation of the partnerships, the independent nature of the partnerships, and the role played by Merchant Capital as the managing general partner.  The SEC further alleged that the sales of partnership interests were unlawful because the interests were securities but no registration statement had been filed and no exemption was available.

The complaint asserted violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).  The SEC sought a temporary restraining order and preliminary and permanent injunctions prohibiting defendants from further violations of these securities laws and freezing defendants' assets to prevent the misappropriation or dissipation of investor funds.  The SEC also sought an order requiring defendants to disgorge all ill-gotten gains or unjust enrichment and imposing civil penalties on defendants.

2

On November 7, 2002, a consent temporary restraining order was entered under which defendants, although denying any violations of the securities laws, agreed to stop selling interests in registered limited liability partnerships and to limit expenditures and transfers of their assets pending a hearing on the SEC's motion for a preliminary injunction.

On January 13-15, 2003, the Court conducted an evidentiary hearing on the request for a preliminary injunction. By Order entered May 5, 2003, as amended by Order entered June 27, 2003, the Court denied the SEC's request for a preliminary injunction. After numerous extensions of time to complete discovery and to pursue settlement efforts, the case came on for trial before the Court sitting without a jury on January 18 and 20-21, 2005. Now, having considered the evidence presented both at trial and at the preliminary injunction hearing,[1] together with the submissions of counsel, the Court directs entry of final judgment in favor of defendants on the basis of the following findings of fact and conclusions of law.

---

[1] Evidence admitted at the preliminary injunction hearing is part of the trial record. Fed. R. Civ. P. 65(a)(2).

3

# FINDINGS OF FACT

## I.   Merchant Capital

Formed in July 2001, Merchant Capital is a Tennessee limited liability company with its principal office in Brentwood, Tennessee.  (PIT. 35:22-23; Pl.Ex. 2, p. 19.)[2]  Beginning in October 2001, Merchant Capital served as the organizing general partner and the elected managing general partner of twenty-eight Colorado registered limited liability partnerships ("RLLPs").[3] (PIT.35:13-17; PIT.43:14-18; Def.Ex.4.)  Each of the partnerships is named "Evergreen High Yield RLLP," followed by a numerical designation.  (PIT. 45:16-18.)  The Evergreen High Yield RLLPs were formed for the purpose of purchasing, collecting, and reselling consumer debt charged off by financial institutions.  (Pl.Ex.2, pp. 2, 19; PIT.91:4-12.)

---

[2] "PIT." refers to the transcript of the preliminary injunction hearing.  The trial transcript will be referred to as "TT."   Exhibits admitted during the preliminary injunction hearing are referred to as "Pl.Ex." or "Def.Ex.," while trial exhibits are referred to as "T.Ex."

[3] Although Merchant Capital is denominated as a "general partner," it does not have an equity participation in any of the RLLPs.  (Pl.Ex. 2, p. 22; PIT. 575:22-576:2).

4

## II.   Steven C. Wyer and Kurt V. Beasley

Steven C. Wyer is the Chief Manager of Merchant Capital. (PIT. 33:22-23.)   Kurt V. Beasley is the Secretary.   (PIT.34:2.)   Wyer owns 75% of Merchant Capital through an LLC, while Beasley owns the remaining 25% through another LLC.  (PIT.34:14-23; PIT.164:4-15.)

Wyer has experience in the sales and marketing of financial services products and was a principal in the Chicago, Illinois, securities firm of Elwin, Wilbert and Hague.  (PIT.50:22-51:1; Pl.Ex.3b.)  Prior to forming Merchant Capital, Wyer was the President and CEO of Wyer Creative Communications, Inc., an integrated direct marketing company focused on the financial services industry.  (PIT.51:8-12; Pl.Ex.3b).  In 2000, Wyer filed for personal bankruptcy as a result of unpaid debts of Wyer Creative Communications that he had guaranteed.  (PIT. 51:18-52:7.)

Kurt Beasley has a law degree from Nashville School of Law and is a certified public accountant.  Mr. Beasley is the founder of Beasley, Tyson & Altshuler, a law firm located in Brentwood, Tennessee.  His law practice

5

AO 72A
(Rev.8/82)

concentrates in areas of banking, asset protection, and general corporate representation. (Pl.Ex.3b.)

From the date of formation of Merchant Capital in 2001 through the date of trial, Wyer received total payments from the Merchant Capital business in the approximate amount of $900,000, and Beasley received total payments in the approximate amount of $268,000. (TT. 256:22-257:3.)

## III.    The Origin of Merchant Capital

Wyer and Beasley initially learned about the business of buying charged off consumer credit card debt through Wyer's personal research, which began in early 2001. (PIT. 35:6-9.) Prior to that time, neither Wyer nor Beasley had any debt collection experience. (PIT.545:17-24.) Wyer began his research on the Internet. He also read articles and interviewed people who were active in the industry. (PIT.546:8-16.)

In the spring of 2001, Wyer met Fred Howard, the principal owner of former relief defendant New Vision Financial, LLC ("New Vision").[4]  (PIT.

---

[4] The SEC named New Vision as a relief defendant solely for the purpose of
(continued...)

6

36:10-23.) Beasley later met Howard in the summer of 2001. (PIT.169:7-10.) Howard introduced Wyer to New Vision's business and to the industry generally. He told Wyer about the mechanism of the Colorado RLLP, how New Vision's business worked, and how New Vision's RLLPs were funded. (T.37:2-6.) At the time Wyer initially spoke with Howard, New Vision had already organized and managed more than fifty RLLPs. (PIT. 37:21-23.) As of the date of the hearing in this action, New Vision had formed more than ninety RLLPs. (PIT.340:24-25).

Shortly after meeting Wyer, Howard supplied him with audited financial statements of New Vision's RLLPs that reflected their historical financial performance. (PIT.128:1-8; T.227:15-20.) Howard also supplied Wyer with a spreadsheet that showed New Vision's "break even" business model. (PIT.108:5-12; PIT.324:13-23; PIT.567:16-24.) The model reflected the monthly target performance goals necessary for an RLLP to return 100% of the partners' capital contributions at the conclusion of the thirty-six month anticipated life of the RLLP, along with the projected partnership

[4](...continued)
obtaining an accounting.   On January 16, 2003, following submission of the required accounting, the Court entered an Order concluding New Vision's involvement in the case.

7

distributions. (PIT.474:6-18.) Howard told Wyer that the New Vision RLLPs that repurchased debt with proceeds from the sale of existing debt (the same model ultimately chosen by Merchant Capital) were performing consistent with the model. (PIT.567:25-568:3; PIT.228:8-11.)

After Beasley first discussed this new business opportunity with Wyer, he did extensive personal research regarding RLLPs. (PIT.169:18-22.) Beasley learned that both New Vision and another business in the industry, Collect America, used the RLLP structure. (PIT.492:5-12.) Beasley visited the offices of New Vision and met with Fred Howard and New Vision's legal counsel. He requested and received copies of various legal opinions from New Vision's counsel and spoke at length with New Vision's counsel regarding the structure of the RLLP, as well as the actual historical performance of the New Vision RLLPs. (PIT.492:23-493:6.)

Beasley spent the next several months learning as much as he could regarding RLLPs. He retained the Nashville firm of Baker, Donelson, Bearman & Caldwell and requested that firm's independent evaluation of the RLLP entity and the proposed structure of Merchant Capital's business. He

8

specifically requested an analysis and evaluation from the firm regarding whether a Merchant Capital RLLP partnership interest should be considered a security. (PIT.493:9-22; Pl.Ex.17.) Merchant Capital received a formal legal opinion letter from Baker, Donelson stating that the Evergreen High-Yield RLLP partnership interest "should not be viewed as a security." (PIT.497:11-15; Pl.Ex.17.)

Merchant Capital also reviewed and relied upon several other legal opinions that were provided to Merchant Capital by New Vision's counsel. One of those opinion letters had previously been issued at the request of Collect America and similarly opined that RLLPs were not subject to the federal securities laws. (PIT.494:3-16; Def.Ex. 7.) A third opinion letter reviewed by Merchant Capital dated May 25, 2001, from a Florida law firm further confirmed the opinion that an RLLP was not subject to the federal securities laws. (PIT.494:25-495:21; Def.Ex.8.)

New Vision's counsel also provided Merchant Capital with an opinion letter from the Houston office of the law firm of Chamberlain, Hrdlicka, White, Williams & Martin. (Def.Ex.9). That opinion letter, dated May 31,

9

2001, opined that RLLP partnership interests "are not securities under the Texas Securities Act." (PIT495:22-496:16; Def.Ex.9.)

Finally, New Vision provided Merchant Capital with a "no-action" letter from the State of Texas, in which the staff of the Texas State Securities Board took a "no-action" position on the issuance of partnership interests in a general partnership entity formed to buy and collect receivables of small businesses, thereby concluding that the partnership interests were not securities. (PIT.496:12-22; Def.Ex.6.)

Beasley reviewed, evaluated, and relied upon these legal opinion letters when deciding to use the RLLP structure in connection with Merchant Capital's business. (PIT.491:9-12; PIT.496:23-25.)

## IV.    The Market for Charged-Off Credit Card Debt

When an unsecured consumer account has been in default for a determined period of time (approximately 180 days), the internal policy of many national credit grantors requires that the account be charged off of the issuer's financial statements. (Pl.Ex.2, p. 2.) Once the account is charged off,

10

the issuer can continue to attempt collection efforts, but because the collection process has evolved into a unique time and labor intensive process, many credit grantors choose to sell all or portions of this charged-off debt. (*Id.*)

This charged off debt is known in the industry as "fresh debt." Fresh debt is debt that is purchased directly from the credit card issuer after it is charged off by the issuer, usually after 180 days of unsuccessful collection history. (PIT.549:6-9.) "Secondary debt" is debt that has been worked by one collection agency and is then offered for sale a second time. (PIT.549:10-14.) "Tertiary debt" is debt that has been worked by two collection agencies and is offered for sale for the third time. (PIT.549:15, 16.) "Quad debt" is debt that has been worked by three collection agencies and is then offered for sale for a fourth time. (PIT.549:17-19.) The cost per dollar of the debt generally becomes lower as the debt moves from fresh to secondary to tertiary to "quad." (PIT.549:20-23.)

Typically, credit card issuers pool fresh delinquent credit card debt and either sell it at auction or sell it to companies that purchase it pursuant to

11

"forward flow contracts" (contracts that obligate the credit card issuer to sell periodically, and the company to purchase periodically, a certain minimum amount of debt at agreed-upon pricing) or pursuant to single sale contracts. (PIT.67:7-17.) "Fresh debt" files can be purchased from credit card issuers with face values that range from less than $25,000 per file (or "pool") to as large as $35,000,000 per file. (PIT.339:16-340:16; PIT.398:7-8; PIT.399:1-7; PIT.561:5-7.)

Purchasers of debt are also able to purchase debt known as "in-house returns." (PIT.400:22-401:4.) These files, which consist of accounts in which the debtors have breached payment plan agreements directly with the issuer, can be purchased from debt issuers in small face amounts. (PIT.400:10-21.) Secondary, tertiary and "quad" debt can be purchased at virtually any face amount. (PIT.403:8-12.)

Banks also have what are called "one-off sales," in which they sell "fresh" debt files that remain after they have sold larger debt pools to their forward-flow contract purchasers. (PIT.410:4-13.) In these "one-off sales,"

12

the debt files sold directly by the bank may be offered for sale for as little as $25,000. (PIT.410:4-13; PIT.561:5-7.)

## V.    Returns Anticipated to be Generated by the Merchant Capital RLLPs

Each RLLP is limited to no more than twenty partners. (Pl.Ex.2, p. 2.) There are approximately 485 partners in the twenty-eight RLLPs. (PIT. 43:19-20.) The minimum capital contribution permitted from a partner in an RLLP was $25,000. The maximum capital contribution permitted was $3,000,000. (Pl.Ex.2, p. 4.) Approximately $26,000,000 of capital contributions were made by the partners during the period from the formation of the first RLLP in October 2001 through the funding of the last RLLP in November 2002. (PIT.35:22-24; PIT.43:13-22.)

Each Merchant Capital RLLP contemplates a thirty-six month life of the business, with the partners having the option of a projected 3.6 percent quarterly return or, alternatively, a projected deferred annual return of 16.5 percent, which is paid upon the termination of the partnership at month 37. (PIT.566:2-7.) The RLLP contemplates the return of all of the partners'

capital contributions at the conclusion of the thirty-six month period, in addition to the quarterly or deferred annual return. (PIT.556:8-11.)

These high returns, 14.4 percent in the case of quarterly returns or 16.5 percent in the case of a deferred annual return, reflect the level of risk that is inherent in the business.   (PIT.566:12-18.)   Merchant Capital never guaranteed these rates of return, or any rates of return, to any of the prospective partners.   (PIT. 566: 21-23.)   In fact, Merchant Capital specifically advised the prospective partners that these rates of return might not be achieved. (PIT.566:24-567:5.)

In the partnership application, Merchant Capital expressly advised prospective partners of the risks associated with the business and the fact that the businesses might not perform as anticipated:

> *Applicants are advised that there are SIGNIFICANT RISKS involved in the buying and subsequent collection of charged-off debt. As a result, becoming a General Partner is only appropriate for those persons capable of withstanding the risk of losing their entire capital contribution. While the Organizing General Partner is confident that it has done its very best to mitigate these risks and to develop adequate contingency plans, it can offer no guarantees.*

14

1.   *The actual rate of recovery for the collection of the purchased debt may be higher or lower than projected. In fact, there are no assurances that any amount, for a specific pool(s) of debt purchased, can actually be recovered. Further, the actual amount of time necessary to recover an acceptable return may be so long as to materially reduce any rate of return.*

. . . .

3.   *An economic downturn of any serious proportion or a national crisis could adversely affect the ability to collect on a timely basis.*

(Pl.Ex.2, p. 10.)(Emphasis in original.)

## VI.   Structure of the RLLPs

### A.   Merchant Capital's Role as Organizing General Partner

Prior to the election of a managing general partner by each RLLP, Merchant Capital served as the organizing general partner for each RLLP. This fact was disclosed to the prospective partners in the partnership application.  (PIT.574:8-12.)

As the organizing general partner, Merchant Capital performed all of the clerical and administrative duties associated with preparing and

15

distributing the partnership application documents. (PIT.576:5-9.) Merchant Capital also provided its network of financial professionals throughout the country the information and materials necessary to present the RLLP business opportunity to their respective clients. (PIT.576:10-14.) Merchant Capital was also responsible for locating and training these recruiters, most of whom were CPAs, attorneys, insurance professionals, and annuities professionals. (PIT.576:18-25.)

Merchant Capital entered into written agreements with each of its recruiters. (PIT.577:2-3.) Merchant Capital required each of its recruiters to agree that under no circumstances would they make the following representations to any prospective partner:

    a. That an RLLP is "guaranteed."
    b. That an RLLP is "safe" and/or "without risk."
    c. That an RLLP has been "approved" by any state or federal
       regulatory organization.
    d. That your efforts are for the "sale of" or "solicitation of
       offers to buy."
    e. That the RLLP is an "investment contract."
    f. That the RLLP represents an indebtedness, profit-sharing
       arrangement or certificate, or another form of investment
       security.
    g. That the RLLP represents the "selling" of "partnership
       interests" to "investors" or "soliciting" "subscribers" to
       make passive "investments" by "subscribing for" and

AO 72A
(Rev.8/82)

> "buying" "units of Partnership interests" for "proceeds of sale."
> h.  That the RLLP will pay "dividends" or that "interest" can be paid on the "principal" of "investment funds."
> i.  That the RLLP is an "investment security."

(PIT.578:7-579:9; Gristy Dep., Def.Ex.1.)

Merchant Capital was further responsible for establishing the escrow relationship with U.S. Bank and for establishing the specific escrow accounts for each RLLP and performing the associated clerical and administrative duties. (PIT.576:14-17.)

As the organizing general partner, Merchant Capital received a fee of fifteen percent (15%) of the total capital contributions.  (PIT.56:3-7; Pl.Ex.2, p. 3.)  From that fifteen percent (15%) fee, Merchant Capital then paid commissions to the "recruiters" who introduced the partners to Merchant Capital.   These commissions ranged from seven percent (7%) to eleven percent (11%) of the total capital contributions made by each partner. (PIT.56:8-19.) The remainder was used to fund Merchant Capital's ongoing business.

17

**B.    Role of the Partners**

Section 7.2 of the RLLP partnership agreement defines the role of the

partners:

> **Management**.  The participation in this RLLP is not a
> passive involvement.  The General Partners themselves will
> manage the RLLP. Each and every General Partner is required
> to actively participate in important business decisions affecting
> the RLLP by exercising its voting privileges.  Each General
> Partner may be required to participate in one or more
> committees, which shall oversee and conduct important business.
>
> These committees may include the following: Accounting and
> Audit; Legal Oversight; Planning, Budget, and Finance; and
> Debt Pool Acquisition.
>
> By establishing the above committees, each General Partner will
> have the opportunity to be involved in the day-to-day
> management of the business of the RLLP and have meaningful
> input by utilizing both personal and business expertise and
> experience in the performance of partnership duties, even if
> located some distance from the RLLP's place of business. Thus,
> each General Partner will have *active control* of the RLLP's
> affairs.  The RLLP will hold formal and informal committee and
> RLLP meetings at various geographic locations, including the
> offices of the RLLP's place of business. All meetings will be open
> to attendance by all General Partners either in person, by
> conference telephone, by video teleconference, or otherwise.

(Pl.Ex.2, p.29.)(Emphasis in original.)

18

Each of the partners makes a specific representation that he or she understands the need to actively participate in the business affairs of the RLLP and agrees to do so:

> Each General Partner represents that it understands that the success of the RLLP's business will depend upon the ***active participation and involvement in RLLP matters by all General Partners***. Each General Partner undertakes and agrees to devote such time and energy as is reasonably necessary to assist in the management of the RLLP's business and use its best efforts to participate in RLLP meetings and actions by written consent.

(Pl.Ex.2, p.29.)(Emphasis in original.)

Although the partnerships have contracted with Merchant Capital to have some of the management functions performed by Merchant Capital and by persons with whom Merchant Capital contracts, the partnership agreement is clear that Merchant Capital does not have the authority to manage the partnership. The partnership agreement makes it clear that only the partners have authority to manage the business, and with respect to the primary partnership decision, the purchase and sale of debt, Merchant Capital is expressly prohibited from acting without the approval of two-thirds of the partners in each partnership.

19

The partnership agreement expressly reserves to the partners the following powers: (i) the ability to call meetings for any purpose and to hold regular quarterly meetings (Pl.Ex.2, Section 7.9); (ii) the ability to control the managing general partner by requiring a two-thirds vote of the units in the partnership to permit the managing general partner to enter into any obligation in excess of $5,000 or incur any expenses in excess of $5,000 per month (Pl.Ex.2, Section 7.6) (PIT.83:21-84:1); (iii) the ability to participate in one or more committees (Pl.Ex.2, Section 7.2); (iv) the ability to elect a managing general partner and to remove the managing general partner by a two-thirds vote of the units if the managing general partner materially fails to carry out its duties (Pl.Ex.2, Section 7.8); (v) the ability to inspect all of the books and records of the general partnership (Pl.Ex.2, Section 12.6); (vi) the ability to approve additional funding after the initial closing of the partnership by a two-thirds vote of the units of the partnership (Pl.Ex.2, Section 4.3); and (vii) the ability to amend the partnership agreement by either a two-thirds or unanimous vote depending on the type of amendment (Pl.Ex.2, Sections 7.1, 13.1 and 13.3). The partners also have the ability to dissolve the partnership prior to the original stated term. (Pl.Ex.2, Section 9.1.)

Merchant Capital advised all of its prospective partners that the RLLPs are not securities and are not registered with the SEC. (PIT.498:10-13; Pl.Ex.2, front cover.)   This disclosure was made based upon Merchant Capital's own research and upon the legal opinion letters that Merchant Capital had reviewed. (PIT.499:12-16.)

Most of the partners were introduced to Merchant Capital through existing relationships that the partners had with financial professionals who also served as "recruiters" for Merchant Capital. (T.54:21-55:1.)   RLLP partners were not required to have any prior debt collection experience. (PIT. 47:19-21.) Nor were they required to be "accredited investors." (PIT.47:15-18.)

Prospective Merchant Capital RLLP partners applied for the partnership by filling out an application form that was contained in the partnership application packet. (PIT.44:5-21; Pl.Ex.2.)   The application packet that a prospective partner received contained general information regarding the RLLPs, information regarding the consumer debt collection industry in the United States, a description of the relationship of the entities

21

involved, a form of a Colorado registration form, a form of certificate of general partnership, a ballot for the election of managing general partner, the partnership agreement, the partnership agreement signature page, a Colorado RLLP registration statement, a questionnaire seeking individual applicant information, a wire transfer deposit authorization, and other information. (Pl.Ex.2, pp. 1-50.)

Along with his or her completed application, a prospective partner submitted a ballot indicating its choice for managing general partner. Merchant Capital informed the partners that it was qualified to serve in that capacity but did not require the partners to vote for it. (PIT.58:8-16; Pl.Ex.2, p. 14.) The evidence is in dispute as to whether any partner ever voted for anyone other than Merchant Capital.   (PIT.58:25-59:1; PIT. 305:22-25.) Regardless, Merchant Capital was elected by a two-thirds majority of each of the twenty-eight RLLPs to serve in that capacity.  (PIT.58:23-59:6.)

At the time each RLLP was closed, Merchant Capital provided the partners with a list of the names, city of residence, and degree of equity participation of each of the other partners.  The evidence is in dispute at to

22

whether partners were also provided the addresses and telephone numbers of each of the other partners, but this information was available upon request. (PIT.593:15-20; Richter Dep., p. 23, Ex. 200; Johnston Dep., p. 14, Ex. 151.)

The actual degree of each partner's involvement in the business of the RLLPs varies greatly, depending on the extent to which the partner chooses to exercise the managerial powers reserved to the partners in the partnership agreement. Some of the partners are extremely active, while others have minimal participation. (PIT.77:3-7.)

Each RLLP has quarterly meetings in which the partners are invited to participate. The first quarterly meeting of each RLLP was scheduled approximately three months after the closing of the partnership. (PIT.81:16-23.) During the course of the quarterly meeting, the partners are provided additional information regarding their monthly statements and any questions that the partners have are answered. (PIT.81:25-82:1.)

23

The partners have all of the information necessary to perform the same analysis that Merchant Capital performs in evaluating the potential purchase or sale of debt. (PIT. 586:10-12.) The monthly statements that the partners receive, coupled with the ballots that are sent to the partners, provide the partners with the name of every pool of debt in which they own an interest, the date that the interest was purchased, the length of time that the RLLP has held the interest, and both the historical gross and net collections from the debt. (PIT.586:10-24.) In addition, all the partners have complete access to the RLLP's books and records in accordance with the express terms of the RLLP's partnership agreement. (PIT.586:25-587:2; Pl.Ex.2, p.9.)

The partners frequently request information from Merchant Capital related to the business of the RLLP. (PIT.587:21-588:1.) Merchant Capital generally complies with such requests. (PIT.588:2-5.) Only two partners have ever complained to Merchant Capital about an alleged failure to provide requested information. (PIT.600:1-6; Reiter Dep. 30-32, 35-37, 44-50, Ex. 18, 22; TT.387:14-20.)

24

The partners are capable of affording and understanding the risk associated with the business of the RLLPs.  Steven Wyer testified that Merchant Capital instructed its recruiters to look for potential partners who had a minimum net worth of $250,000 with good general business knowledge and experience, and who were willing to actively participate in the management of the business of the RLLP.  (PIT.579:14-19.)

Each partner has a net worth of at least $250,000 and more than 75% of the partners reported net worth in excess of $500,000.  (PIT. 579:20,21; 596:2-25.)  A significant number of the partners have a net worth in excess of $1,000,000.   (PIT.596:11-23.)   Ninety percent (90%) of the partners reported that their business experience ranged from "average" to "excellent."  (PIT.597:1-4.)

The Court finds that the partners have the ability to actively participate in the management of the business of the RLLPs.  The RLLP partnership agreement does not leave so little power in the hands of the partners that the arrangement distributes power as would a limited partnership.  The partners are not so inexperienced and unknowledgeable in

25